UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Lorelei Ann Hodgdon Smead,

      Plaintiff,

      v.                          Civil Action No. 1:13-cv-185

Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 8, 11)

Plaintiff Lorelei Ann Hodgdon Smead brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Smead's motion to reverse the Commissioner's decision (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 11). For the reasons stated below, I recommend that Smead's motion be DENIED, and the Commissioner's motion be GRANTED.

## Background

Smead was 40 years old on her alleged disability onset date of January 1, 2001. She has a high school education and has taken courses in business management. She has worked as an office manager, a waitress, a receptionist, a store owner, and a business manager. She has been married to her second husband since approximately 2000, and

has two grown children and one grandchild.  She and her husband own a business called Smead Woodcraft which manufactures handcrafted wood cutting boards.  Prior to marrying her husband, she helped start another business known as Brick House Tile.

Since approximately 2000, Smead has suffered from debilitating migraine headaches which vary in severity and are aggravated by stress.  She also suffers from back pain, body aches, and pain in the right side of her face, among other ailments. Smead testified at the August 2010 administrative hearing that, on a typical day, she is "totally in pain" and can manage only to shower, take her medications, prepare and eat simple meals, go to doctor's appointments with the assistance of her mother or husband, and occasionally go shopping with the assistance of her mother.  (AR 45–46; *see also* AR 1381–85.)  She further testified that she lies down for over three hours each day, and is unable to do any household chores on her own.  (AR 46; *see also* AR 1388.)  She stated: "My days are just trying to make it through th[e] day [in] as [little] pain as I can and trying to remember my doctors' appointments."  (AR 47.)  At her more recent January 2013 hearing, Smead testified that she "can't walk anywhere," given that she has pain everywhere in her body.  (AR 1381.)  She also testified that she has such significant memory problems that she could not recall someone with whom she had been "really good friends."  (AR 1388.)

In August 2008, Smead protectively filed applications for supplemental security income and disability insurance benefits.  Therein, she alleged that, starting on January 1, 2001, she was unable to work due to "[s]evere migraines and back problems." (AR 136.)  She also alleged that she had problems with her memory, and that doing

anything physical caused her extreme back pain.  (*Id.*)  In an updated report, Smead

stated that her physical impairments were worsening, leaving her in bed more often.  (AR

173.)  She stated: "[my] migraines are more frequent and [my] back pain is worse[; I]

can't do much of anything."  (*Id.*)  She further stated that she "might" have fibromyalgia

but needed a second opinion to confirm the diagnosis.  (*Id.*)  In a more recent report,

noting that her "pain is 100% worse than ever," Smead stated: "now [I] have

[fibromyalgia] and trigeminal neuralgia."  (AR 238.)

Smead's disability application was denied initially and upon reconsideration, and

she timely requested an administrative hearing.  The hearing was conducted on

August 30, 2010 by Administrative Law Judge ("ALJ") Thomas Merrill.  (AR 23–55.)

Smead appeared and testified, representing herself.  Her husband, Donald Smead, also

testified, along with a vocational expert ("VE").  On October 25, 2010, the ALJ issued a

decision finding that Smead was not disabled under the Social Security Act from her

alleged onset date of January 1, 2001 through the date of the decision.  (AR 7–17.)

Smead appealed the ALJ's decision to this Court, and on February 2, 2012, pursuant to

the parties' agreement, the Court remanded the matter to the Commissioner for further

proceedings.  (AR 1419–23.)  A second administrative hearing was conducted by ALJ

Merrill on January 14, 2013.  (AR 1348–96.)  Smead again appeared and testified, this

time represented by counsel.  A medical expert, neurologist Dr. Gerald Winkler, also

testified.  On March 18, 2013, the ALJ issued a new decision, finding for a second time

that Smead was not disabled from her alleged onset date of January 1, 2001 through the

date of the decision.  (AR 1309–21.)  Smead did not file written exceptions to the ALJ's

decision on remand, and thus the decision became final.  *See* 20 C.F.R. §§ 404.984(a),

416.1484(a).  Having exhausted her administrative remedies, Smead filed the Complaint

in this action on June 25, 2013.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity ("RFC"), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Smead had

not engaged in substantial gainful activity since her alleged disability onset date of

January 1, 2001.  (AR 1311.)  At step two, the ALJ found that Smead had the severe

impairments of migraine headaches, trigeminal neuralgia, and low back pain.  (AR 1312.)

Conversely, the ALJ found that Smead's depression and anxiety were non-severe.  (AR

1312–13.)  Regarding Smead's fibromyalgia, the ALJ stated that he was "constrained to

find no medically determinable impairment [, but] . . . will consider [Smead's] reported

chronic pain as falling under the severe impairments listed above."  (AR 1313 (citation

omitted).)  At step three, the ALJ found that Smead's impairments did not meet or

medically equal a listed impairment.  (*Id.*)  Next, the ALJ determined that Smead had the

RFC to perform "the full range of work at all exertion levels, except she should avoid all

exposure to unprotected heights due to pain."  (AR 1314.)  Given this RFC, and

considering the VE's testimony at the first hearing, the ALJ found that Smead was able to

perform her past relevant work as a store owner, a bookkeeper, a receptionist, and a

waitress.  (AR 1320.)  The ALJ concluded that Smead had not been under a disability

from her alleged disability onset date through the date of the decision.  (AR 1321.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

## I.      RFC Determination

Smead contends the ALJ erred in determining that she has the RFC for a "full range of work at all exertion levels."  (AR 1314.)  Specifically, Smead claims the ALJ incorrectly concluded at step two that there was no evidence of "a formal diagnosis [of fibromyalgia] as well as the required diagnostic criteria" (AR 1313), and then erred in failing to account for her fibromyalgia symptoms in his RFC determination.  (Doc. 8 at 4.)  As the Commissioner concedes (Doc. 11-1 at 12), there is in fact a diagnosis of fibromyalgia in the record, and thus the ALJ erred in finding otherwise.  Specifically, although in December 2009, treating rheumatologist Dr. Nicole Orzechowski stated in a treatment note that Smead "does not have fibromyalgia" and "has [no] rheumatologic problem" (AR 907); in January 2011, Dr. Orzechowski stated that Smead "has all of the fibromyalgia tenderpoints" and assessed fibromyalgia along with migraine headaches and trigeminal neuralgia (AR 1630).  Likewise, almost two years earlier, orthopedist Dr. John Chard stated in a March 2009 treatment note that "tenderness in . . . multiple areas bilaterally suggests the possibility of fibromyalgia as perhaps an etiology or . . . a complicating factor."  (AR 630.)

The ALJ's step-two error was harmless, however, because the ALJ explicitly considered the symptoms of Smead's fibromyalgia at later steps in the sequential analysis, stating as follows at step two: "[I] will consider [Smead's] reported chronic pain as falling under the severe impairments listed above."  (AR 1313.)  This statement and analysis complied with the applicable regulations and case law, which require that "all . . . medically determinable impairments" be considered in determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(2); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding alleged step-two error harmless because ALJ considered impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (same).  Moreover, the mere diagnosis of fibromyalgia is not enough to show disability; it is the severity of the fibromyalgia symptoms and the limitations caused thereby that matter most.  *See Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (although "fibromyalgia is 'a disease that eludes [objective] measurement,' mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability") (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)) (citation omitted).  Here, the evidence does not indicate that Smead's fibromyalgia was significantly limiting.

First, when Dr. Orzechowski assessed fibromyalgia in January 2011, she stated that Smead's "affect [is] not appropriate for the amount of pain she is telling me she has," indicating the doctor's reservations about the fibromyalgia assessment because of her

doubt regarding Smead's credibility.[1]  (AR 1630.)  Second, there is no evidence that

Smead received specialized treatment for fibromyalgia, even after Dr. Orzechowski's

January 2011 assessment of the condition.  Dr. Orzechowski stated in January 2011 that,

generally, Cymbalta and Lyrica are prescribed to treat the symptoms of fibromyalgia, but

for various reasons, it was determined that neither of those medications would be

prescribed for Smead.  (*Id.*)  Instead, Smead was instructed to "work[] on her sleep and

get[] some low[-]impact aerobic exercise."  (*Id.*)  No follow-up appointment was

scheduled with Dr. Orzechowski at that time.  (*Id.*)  Although in May 2011, Smead

reported at a medical appointment to address her "significant disabling headaches" that

she had been "'sick in bed for [one] month' with fibromyalgia" (AR 1697), she does not

appear to have sought medical treatment for fibromyalgia in that month, and no

medications were prescribed to treat the condition (AR 1698).  On January 3, 2012,

Smead sought treatment at the Emergency Department, stating that her migraine

headaches, fibromyalgia, and trigeminal neuralgia had been "acting up" for about a week.

(AR 1549.)  But later that day, she had "complete relief of pain after IV [medication],"

and reported that "all her symptoms ha[d] resolved" and she had "never felt better."  (AR

1551.)

Given this evidence, and the lack of evidence suggesting any functional limitations

derived specifically from Smead's fibromyalgia and not from her migraine headaches or

---

[1]  Similarly, Dr. Chard stated in March 2009 that "the intensity of [Smead's] pain seems to be
greater than one would exp[ect] on the basis of the imaging studies."  (AR 630.)  And in August 2009,
consulting psychologist Michael Italia, MA, stated that "[i]t did require effort . . . to be empathetic and
tactful in working with Mrs. Smead[, as s]he was a bit dramatic at times."  (AR 677.)  Finally, Nurse
Practitioner Jean-Anne Brown stated in a September 2006 treatment note that Smead "does not appear to
be in much pain, although she relates that she is."  (AR 1106.)

trigeminal neuralgia, the ALJ's following statements are accurate: "the majority of the records from 2012 indicate no diagnosis of fibromyalgia, and no evaluation of trigger points to confirm the diagnosis"; and "[Smead's] physicians were mainly treating her back pain, migraines, and trigeminal neuralgia," not her fibromyalgia.  (AR 1313.) Accordingly, substantial evidence supports the ALJ's decision not to include any limitations in his RFC determination based particularly on Smead's fibromyalgia.

Referencing a psychological evaluation performed by Michael Italia, MA in August 2009, Smead appears to argue that the ALJ should have included mental limitations in his RFC determination.  (*See* Doc. 8 at 4.)  In this evaluation, however, Italia concluded that Smead "appears to have the ability to work on at least a part[-]time basis from a mental health standpoint," and "probably would not require vocational interventions . . . given . . . that she still has a business she is operating on the periphery." (AR 680.)  Moreover, as noted by the ALJ in his decision (AR 1312), Smead herself repeatedly denied having any mental problems.  (*See, e.g.*, AR 171 ("stated right away that she doesn't have anxiety or depression"), 181 ("I don't have mental problems!"), 1379 ("I am on antidepressants.  That doesn't mean I'm depressed. . . .  I'm not a depressed person . . . .  I do take the antidepressants[, but] [t]hat is . . . to relax [my] muscles.").)

## II.    Analysis of Medical Opinions

Smead also claims that the ALJ erred in his analysis of the medical opinions, particularly those of treating primary care physician Dr. Walter Slowinski and testifying medical expert Dr. Winkler.  Dr. Slowinski opined in September 2010 that Smead could

10

never lift or carry any weight; could sit for only 30 minutes, stand for only 10 minutes, and walk for only 20 minutes at a time; and could sit for only 60 minutes, stand for only 30 minutes, and walk for only 40 minutes total in an eight-hour workday, spending the rest of the workday laying down.  (AR 1299–1300.)  Dr. Slowinski further opined that Smead could occasionally climb stairs and ramps but could never perform other postural activities such as balancing, stooping, kneeling, or crouching; could never tolerate exposure to various conditions including moving mechanical parts, humidity, and extreme cold; would be required to work in a quiet environment; and could not sort, handle, or use paper files.  (AR 1302–04.)  Dr. Slowinski attributed these limitations to Smead's chronic back pain, fibromyalgia, migraine headaches, and trigeminal neuralgia.  (AR 1299–1304.)

     In contrast, at the January 2013 administrative hearing, Dr. Winkler testified that Smead's conditions, including her trigeminal neuralgia and migraine headaches, lacked objective findings on examination.  (AR 1354.)  He stated that these conditions are characterized by pain and thus are based on "a purely subjective experience so that doctors and others who have an interest in evaluating the[m] . . . must rely on the account of the claimant . . . to ascertain[] the quality of [the] pain, its severity[,] . . . its frequency[,] and all of its other characteristics."  (*Id.*)  In an attempt to "try to glean some indication of the impact of [Smead's] pain conditions on [her] functional capacity," Dr. Winkler considered Smead's daily life during the relevant period.  (*Id.*)  He observed that, according to documents in the record, Smead traveled to Florida and St. Lucia during the relevant period; engaged in work activity at various times in 2007, 2008, and

2009; walked a mile three times a day; and cared for her brother who was rendered quadriplegic[2] in an accident.  (AR 1354–56.)  Dr. Winkler considered Dr. Slowinski's opinions, and found that they were unsupported by the objective medical evidence and the record in general.  (AR 1356, 1361–62.)  Dr. Winkler explained:

> I think that we are, the situation in summary is that [Smead] has reported conditions consistent with migraine headaches, chronic daily headache, trigeminal neuralgia, all painful conditions characterized by pain, *which is truly subjective*[.] . . .  [A]n assessment . . . is largely available to the Court through an analysis of residual functional capacity[, which] I've attempted to outline for the Court to assist in their evaluation.

(AR 1357 (emphasis added).)

The ALJ gave "little weight" to Dr. Slowinski's opinions and "great weight" to Dr. Winkler's.  (AR 1315, 1320.)  He explained that Dr. Winkler's opinions are consistent with the medical evidence and based on Dr. Winkler's specialized knowledge of the regulations and the practice of neurology.  (AR 1315.)  In contrast, the ALJ found that Dr. Slowinski's opinions are not supported by the medical evidence.  (AR 1320.) The ALJ explained that the record demonstrates Smead experienced pain relief with medication.  (*Id.*)  The ALJ also found that "numerous diagnostic tests failed to identify any unusual findings," making Dr. Slowinski's opinions implausible.  (*Id.*)  Finally, the ALJ found that Dr. Slowinski's opinions are inconsistent with Smead's daily activities, as recorded mostly in medical treatment notes, including going on trips and vacations, attending family events, and working with her husband in their woodworking business. (*Id.*)  Although Smead claims many of these activities were inaccurately recorded, the

---

[2]  The record indicates that Smead's brother was in fact rendered paraplegic, not quadriplegic.

ALJ reasonably stated:  "[I]t is hard to imagine so many incorrect references in one record.  Further, [Smead's] physicians have no motivation to include false information within her medical records, whereas [Smead's] motivation to report reduced activities at the hearing is very clear."  (*Id.*)

The opinion of a treating physician such as Dr. Slowinski is afforded "controlling weight" when it is "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial [record] evidence."  20 C.F.R. § 404.1527(c)(2).  The deference given to a treating physician's opinion may be reduced, however, in consideration of other factors, including the length and nature of the physician's relationship with the claimant, the extent to which the medical evidence supports the physician's opinion, whether the physician is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors "which tend to . . . contradict the opinion."  20 C.F.R. § 404.1527(c)(2)–(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

I find that substantial evidence supports the ALJ's decision to afford "little weight" to Dr. Slowinski's opinions (AR 1320) and "great weight" to Dr. Winkler's (AR 1315).  I further find that the ALJ gave "good reasons" to support this decision.  *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons . . . for the weight we give your treating source's opinion."); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).  First, the ALJ correctly found that Dr. Slowinski's opinions are not supported by the objective medical record.  Smead frequently reported to medical providers that prescribed medications and epidural steroid and intramuscular injections provided relief of her pain.

13

(*See, e.g.*, AR 495 ("has had a good result [with] Toradol in past"), 510 ("'I feel great'"),

738 ("last [injection] helped her pain for 3 months"), 740 ("migraines are in good order,"

"she can control them quite well"), 752 ("has been able to control all of her headaches

with her medication"), 882 ("low back pain is doing much better [after] . . . epidural

block," "migraines are not the issue," "trigeminal neuralgia seems well controlled and she

verifies that"), 1088 ("[h]eadaches have been 'pretty good,'" "[s]he treats early and

effectively," "severity is decreased").)  Both Dr. Winkler and agency consultant Dr.

Christine Conley found a lack of objective medical evidence to support Dr. Slowinski's

opinion that Smead had significant exertional, postural, and manipulative limitations.

(AR 622, 626, 1356, 1361–62.)

Moreover, the ALJ correctly determined that Dr. Slowinski's opinions are

inconsistent with Smead's daily activities including air travel within and outside the

United States; working at her family owned business making handcrafted cutting boards;

and caring for severely ill family members including her paraplegic brother.  The record

is replete with references to these activities.  (*See, e.g.*, AR 485 ("[j]ust returned from

Dominican Republic"), 488 ("overdoing it at work"), 498 ("caring for father"), 519 ("on

vacation to Alaska"), 550 ("took care of [father-in-law] until his death"), 591

("[e]mployed with her husband," "will be traveling to Utah"), 629 ("owns her own

company called Smead Woodcraft and . . . is active in sales and production," "some days

. . . unable to work"), 658 ("[w]orks with her husband [at] Smead woodworking

projects"), 666 ("recently went on a mission trip to St. Lucia"), 680 ("still has a business

she is operating on the periphery"), 787 ("trip tomorrow to Utah," "was able to enjoy

14

some of her vacation, despite headache"), 796 ("ha[d] a good trip to Florida and could do

a lot of things that she wanted to do"), 797 ("going to Hawaii later this month for about

nine days"), 849 ("went to an outdoor wedding in Pennsylvania"), 1088 ("[w]ork is going

well," "has been functioning very well at home"), 1548 ("very anxious [to] take[] care of

her brother due to his complex medical issues"), 1563 ("dealing with her brother . . . who

is a recent paraplegic from an injury," "spent a month with him," "having a large

fundraiser for him which she is totally organizing"), 1567 ("going . . . down to Maryland

. . . for about a month and anticipates doing a lot of work for [her brother],"

"stepdaughter is getting married in two days and then . . . heading down to Maryland to

be with her brother"), 1718 ("she is the primary caregiver for a brother who is paraplegic

after an accident"), 1728 ("[p]lanning a huge fundraiser for her brother . . .[,] trying to

limit herself to 10[-]day periods caring for her brother"), 1732 ("under extreme amount[]

of stress with marital situation and as caregiver for handicapped brother").)

It was reasonable for the ALJ to find that Smead's activities are inconsistent with

Dr. Slowinski's opinions.  For example, a person who could sit for only 30 minutes at a

time and 60 minutes total in a day, as Dr. Slowinski opined Smead was limited to doing

(AR 1300), would have enormous difficulty traveling to places like Alaska, Hawaii, and

the Dominican Republic.  Moreover, a person who could never reach, stoop, kneel, or

crouch, which activities Dr. Slowinski opined Smead could never do (AR 1301–02),

would be hard-pressed to work in sales and production at a woodworking business.

Further, it is doubtful that someone who could never lift or carry any weight and could

stand for only 10 minutes at a time and 30 minutes total in an eight-hour day, other

limitations ascribed to Smead by Dr. Slowinski (AR 1299–1300), could provide primary care for a paraplegic adult.

Considering the record as a whole, and particularly Smead's extensive activities, the ALJ gave less weight to the opinions of treating physician Dr. Slowinski and more weight to the opinions of non-examining consultants Drs. Winkler and Conley.  Dr. Conley's opinions are similar to those of Dr. Winkler.  In a November 2008 RFC assessment, Dr. Conley opined that Smead had no functional limitations, stating as follows:

> [Smead] [has had] many years of headaches, controlled at times, uncontrolled when stress increases.  MRI and MRA of head are negative. . . .  [H]as periods of good control . . . and periods of poor control. . . . [Headaches] do not stop her from functioning per Dr[.] Ward neurologist evaluation.  Alleges severe back pain, [but] . . . MRI and plain films [are] negative as is CT . . . .  [N]ormal neuromuscular exams.

(AR 622.)  Dr. Conley further stated:

> [Smead's] [a]llegations are not credible, states can do nothing, lies in bed and spouse and mother wait on her.  [But] [m]edical evidence notes she works "too much" at times, [and] headaches have not impinged on [her] duties as book[k]eeper for home business . . . .  [H]as frequent travel to Utah several times, to Hawaii and to Florida, has a good time and headaches do not limit.

(AR 626.)  The record supports Dr. Conley's summary of the evidence, as discussed above.  The ALJ gave "substantial weight" to Dr. Conley's opinions, finding that they are "generally consistent with the totality of the medical evidence . . . and with the medical opinions of Dr. Winkler."  (AR 1320.)  I find no error in the ALJ's allocation of weight to these opinions.  Although in many cases it is proper for the ALJ to give reduced weight to

the opinions of non-examining consultants, in favor of the opinions of the examining

medical providers; the regulations clearly permit the opinions of non-examining agency

consultants to override those of examining sources, when the former are more consistent

with the record evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d

Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations .

. . permit the opinions of nonexamining sources to override treating sources' opinions

provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180,

at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . .

consultants . . . may be entitled to greater weight than the opinions of treating or

examining sources.").  Here, the opinions of medical expert Dr. Winkler and agency

consultant Dr. Conley are consistent with the record, while those of treating physician Dr.

Slowinski are not.  Thus the ALJ acted within his discretion in weighing the opinions of

Drs. Winkler and Conley more heavily than those of Dr. Slowinski.[3]

## III.    Credibility Assessment

Smead asserts that the ALJ should not have "chide[d]" her for engaging in the

daily activities described above, and should not have used these activities to undermine

her credibility.  (Doc. 8 at 9.)  She further asserts that the ALJ "completely ignored" her

statements regarding her limitations.  (*Id.* at 7.)  I find, however, that the ALJ properly

---

[3]  Smead argues that the ALJ should have considered that Dr. Slowinski had a lengthy treatment relationship with Smead.  (Doc. 8 at 8.)  As discussed above, the regulations provide that this is a relevant factor to consider in assessing treating physician opinions.  *See* 20 C.F.R. § 404.1527(c)(2)(i).  As the Second Circuit recently held, however, treating physician opinions may be discounted for good reason without "slavish recitation of each and every [regulatory] factor."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31–32).  In this case, as discussed above, the ALJ provided good reasons for discounting Dr. Slowinski's opinions.

considered these statements, and that the ALJ's credibility assessment is legally proper and supported by substantial evidence.

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). Here, the ALJ determined that Smead's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not entirely credible." (AR 1315.) The ALJ reasoned that "the medical evidence fails to support [Smead's] allegations and instead indicates that [she] is capable of far more than she has reported at the hearing." (AR 1319.) The ALJ further explained: "The record is filled with references to vacations, trips, participation in family events, and daily activities that indicate an ability to sustain work at all exertion levels throughout the [relevant] period." (*Id.* (citations omitted); *see also* AR 1318 ("The ability to travel and participate in an active lifestyle i[s] very strong evidence that [Smead] would be able to sustain the demands of full-time work at all exertion levels.").)

Indeed, as discussed above, the record demonstrates that Smead was able to engage in many activities—including travelling, working, and caring for her paraplegic brother—which required a much higher level of functionality than Smead claimed to have.  It was proper for the ALJ to consider Smead's ability to engage in these activities in determining the credibility of Smead's disability claims.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled."); *see also Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009) (citing 20 C.F.R. § 404.1529(c)(3)) ("in assessing the credibility of a claimant's statements, an ALJ must consider . . . the claimant's daily activities").  The ALJ reasonably concluded that evidence of Smead's frequent travel throughout the alleged disability period, ongoing work activity through 2009, and significant caretaking responsibilities for her paraplegic brother in 2011 and 2012, undermined her credibility with respect to allegations of extreme functional limitations.  (AR 1320.)

Smead claims that much of the evidence relied on by the ALJ in determining her level of activity was incorrect, "mistakes" made by medical providers in their written reports.  (Doc. 8 at 6.)  This claim is implausible, however, for the reason stated by the ALJ in his decision: "it is hard to imagine so many incorrect references in one record[, and] [f]urther, [Smead's] physicians have no motivation to include false information within her medical records, whereas [her] motivation to report reduced activities . . . is very clear."  (AR 1320.)  Although the activities reflected in the record and detailed

above—including extensive travel, working at her family business, and caring for her

paraplegic brother—may not have required significant physical effort, they certainly

exceeded the limitations Smead portrayed herself as having during the alleged disability

period.  According to her testimony and reporting in disability forms, she was close to

bedridden during the alleged disability period, other than making very simple meals,

attempting to do undemanding chores with assistance, and going shopping and to doctor

appointments with her mother or husband.  (*See, e.g.*, AR 45, 46 ("[m]y typical day is

going to doctors' appointments, taking my medication," "I can't do anything"), 47 ("my

days are not productive"), 136 ("doing anything physical causes extreme pain"), 144

("pain level 8–10 . . . all the time/never goes away"), 162, 164 (cooks only "[m]aybe

once a week," and only simple foods like a can of soup and toast), 177  ("the pain has

taken over my life"), 227, 228 ("[b]ending over or lifting can put me into a migraine for

5–7 days," "days are the same[,] [d]ealing w[ith] pain and doctors['] app[ointments] all

the time"), 231 (unable to pay bills, count change, handle a savings account, or use a

checkbook), 234, 243 ("[I] need help with everything[, I] go from couch to bed, need

help with little [and] big things"), 1381–89.)  The record simply does not support

Smead's representations of such disabling limitations, and the ALJ was not obliged to

accept Smead's characterization of the record without question, especially when there is

so much evidence to the contrary.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)

("ALJ is required to take the claimant's reports of pain and other limitations into account,

but is not required to accept the claimant's subjective complaints without question; he

may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (citations omitted).

## IV.    Step-Four Determination

Finally, Smead claims that the VE's testimony compels a favorable disability decision, and that the ALJ's determination that Smead could perform her past relevant work is unsupported.  (Doc. 8 at 9–10.)  Given the above findings, the argument fails.

At the first administrative hearing, the VE testified that a hypothetical claimant who had no exertional or non-exertional limitations would be able to perform all of Smead's past relevant work.  (AR 52.)  The VE then testified that there would be no jobs for a hypothetical claimant who was limited to the extent Smead testified she was during the alleged disability period.  (*Id.*)  The ALJ relied on the VE's response to the first hypothetical, finding that Smead could perform her past work as a store owner, an office manager, a waitress, and a receptionist.  (AR 1321.)  According to Smead, the ALJ should have adopted the VE's response to the second hypothetical rather than the first.

Smead's argument fails because an ALJ may rely on the testimony of a VE in response to a hypothetical question "*only if* the question accurately portrays [the claimant's] individual physical and mental impairments."  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks omitted) (emphasis added); *see Priel v. Astrue*, 453 F. App'x 84, 87–88 (2d Cir. 2011); *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (if "substantial record evidence" does not support "the assumption upon which the [VE] based his opinion," the ALJ need not rely on that opinion).  The Second Circuit explained: "The [VE's] testimony is only useful if

it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).   Applied here, the VE's testimony that there were no jobs that Smead could perform was only useful if it corresponded with a hypothetical claimant who accurately reflected Smead's limitations and capabilities during the alleged disability period.  As explained above, however, the ALJ found that Smead's testimony that she was nearly bedridden as a result of her impairments lacked credibility, and substantial evidence supports that finding.  Therefore, the ALJ was under no obligation to adopt the VE's testimony in response to the second hypothetical presented at the hearing.

## Conclusion

I find that the ALJ's RFC determination, analysis of the medical opinions, credibility assessment, and reliance on the VE's testimony, were proper; and that the ALJ's decision that Smead was not disabled is supported by substantial evidence.  Most notably, despite testifying at both administrative hearings and stating in disability paperwork that she was able to do virtually nothing all day other than lay in bed in pain; the record documents significant travel, working with her husband in their woodworking business, and caring for her paraplegic brother.  It is difficult to reconcile this evidentiary conflict, and the Court must afford discretion to the ALJ on this issue.

For these reasons, I recommend that Smead's motion (Doc. 8) be DENIED, the

Commissioner's motion (Doc. 11) be GRANTED, and the decision of the Commissioner

be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 6th day of June, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).
Failure to timely file such objections "operates as a waiver of any further judicial review
of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15,
16 (2d Cir. 1989).